

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

TM:AH/JD/KM
F.#2010R02047

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

November 27, 2011

By ECF and Hand Delivery

The Honorable I. Leo Glasser
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

        Re:  United States v. Anthony Romanello
            10 Cr. 929 (S-1) (ILG)

Dear Judge Glasser:

      Defendant Anthony Romanello, also known as "Rom," is charged in a two-count indictment with participating in a racketeering conspiracy in connection with his association with and membership in the Genovese organized crime family of La Cosa Nostra (the "Genovese crime family") and his possession of a firearm in connection with a crime of violence. The government respectfully submits this memorandum of law in support of its motion in limine to permit the government to introduce at trial certain consensual recordings in which a cooperating witness ("CW#1") discusses various schemes associated with a cement business called Queensboro, for which CW#1 served as the accountant, and which was used by both the Genovese and Gambino crime families, including the defendant and his similarly ranking Gambino family counterpart Carmine Agnello, as a vehicle to perpetuate various frauds in furtherance of organized crime.[1] The use of Queensboro to commit various crimes is evidence of, and is inextricably intertwined with, the defendant's participation in the charged racketeering conspiracy and the charged predicate act

---

      [1]    At some point, the owners of "Queensboro" changed its name to "V&L." For purposes of simplicity, the company will be referred to as "Queensboro" throughout this motion.

Honorable I. Leo Glasser
November 27, 2011

of larceny by extortion.  The consensual recordings are admissible as co-conspirator statements pursuant to Federal Rule of Evidence ("Rule") 801(d)(2)(E) and statements against penal interest pursuant to Rule 804(b)(3).

## BACKGROUND

In connection with his membership in and association with the Genovese crime family, a grand jury returned an indictment (the "Indictment") charging the defendant with participating in a racketeering conspiracy between January 1990 and July 2006, with predicate acts including illegal gambling, larceny by extortion and extortionate collection of credit.  The consensual recordings the government seeks to admit at trial, which have been identified as trial exhibits and are attached hereto, concern the racketeering conspiracy charged in Count One and the predicate act of larceny by extortion (Racketeering Act Two).

The government will prove at trial, through cooperating witnesses and consensual recordings, that the defendant was an acting captain in the Genovese crime family and, as such, required members and associates of his criminal crew to provide a share of their earnings from criminal activity (often referred to as "scores") to him.  In exchange for these payments, and pursuant to the code of conduct of the Genovese crime family and La Cosa Nostra, the defendant offered his associates protection and assistance in resolving disputes, among other things.  For example, if an associate of the defendant had a dispute with an associate of another crime family, the defendant would negotiate on his associate's behalf and resolve the dispute at a "sit-down" attended by the defendant and a similarly ranking member of the other crime family.  Some of the consensual recordings the government seeks to admit concern precisely such a situation.

The evidence the government intends to present at trial will show that Queensboro was jointly owned by Vito Napolitano, an associate of the defendant's in the Genovese crime family, and John Sowulski, an associate in the Gambino organized crime family who reported to captain Carmine Agnello.  The evidence will also show that the Genovese and Gambino organized crime families used Queensboro as a vehicle and means to commit various and lucrative frauds for the financial gain of those crime families, including, among other things, fraudulently double-billing clients and keeping "no-show" employees on the payroll.  In addition to

Honorable I. Leo Glasser
November 27, 2011

Napolitano and Sowulski, Steve Casper, Queensboro's primary employee, and Robert Sowulski, John Sowulski's brother, helped to facilitate the schemes orchestrated through Queensboro.

The evidence will further show that, in the spring of 1999, a dispute arose between Queensboro joint-owners Sowulski and Napolitano, after Napolitano decided that he wanted Sowulski to buy out Napolitano's share in Queensboro.[2] Specifically, the dispute concerned Sowulski's discovery that Napolitano had been "skimming" significant amounts of cash from Queensboro. As a result, the defendant, a captain in the Genovese crime family and representative of Napolitano's interests, and Agnello, a captain in the Gambino crime family and representative of Sowulski's interests, attended a "sit-down" to resolve the disagreement. At the sit-down, which occurred in June 1999, the defendant "lost" to Agnello and, consequently, Napolitano was forced to relinquish his interest in Queensboro to Sowulski without receiving any money in exchange. Essentially, the sit-down resulted in the Genovese crime family, represented by the defendant, losing its interest in Queensboro to the Gambino crime family without receiving any compensation.

The evidence will show that the defendant was angry with Napolitano, who, by skimming money from Queensboro, had caused the defendant and the Genovese crime family to lose Queensboro, through which they had orchestrated various frauds for financial gain. It is against this backdrop that, as charged in Racketeering Act Two (larceny by extortion), the defendant and others agreed to engage in violence to collect money from Napolitano, identified in the superseding indictment as John Doe #2, and made plans during a meeting in June 1999 to carry out the violent collection of money from Napolitano. The government will prove the defendant's participation in this activity through,

---

[2] In consensual recordings on December 15, 1998, April 18, 1999, and September 23, 1999, Sowulski and Casper both informed CW#1 that Sowulski was a silent partner in Queensboro. See Exhibit A, December 15, 1998 Transcript (Sowulski informing CW#1 that Vito and he "went in as partners"); Exhibit B, December 15, 1998 Transcript (Sowulski informing CW#1 that he is a fifty percent owner) Exhibit B, April 18, 1999 Transcript (Casper informing CW#1 that "John always owned fifty percent of this place."); Exhibit C, September 23, 1999 Transcript (Casper explaining that "John was always partners").

3

Honorable I. Leo Glasser
November 27, 2011

inter alia, the defendant's own statements as well as the statements of the defendant's co-conspirators about the scheme to use Queensboro as a vehicle to commit various frauds.

For example, on June 5, 1999, the defendant was intercepted on a court-authorized bug at his illegal gambling club explaining his plan to "punch [Napolitano] around" for "taking the money" and enlisting the help of co-conspirators to try to recoup money from Napolitano:

> So why don't I [UI] to Vito's. We going to go to Vito's? Monday morning, we might get up early and tell that fuck, Jimmy, too. I got to get that cocksucker. Me, you and Jimmy might go get up early Monday. I might come out here and meet yous right out there by Joe's house or something. We gotta [UI]. We got to punch him around, or Jimmy's got to punch him around. I can't let him get away with that. Taking the money and putting the gun to his head. [UI] the gun to his head. We gotta get the cocksucker. Even if we don't get the money, we gotta punch the motherfucker around [UI]. Believe you me. I can't let him get away with that. Look, we got to get there early Monday morning.

I.   CW#1's Testimony and Consensual Recordings

CW#1, who worked as the accountant for Queensboro during the relevant time period, is expected to testify about the ways in which Queensboro was used as a means to commit fraud for financial gain. In addition, CW#1 made consensual recordings in which participants in those frauds explained the various schemes to CW#1 and also informed CW#1 about the involvment of the defendant, on behalf of the Genovese crime family, and Agnello, on behalf of the Gambino crime family, in Queensboro.

A.   CW#1's Testimony Regarding the Use of Queensboro As a Means to Commit Various Frauds

CW#1 is expected to testify that, as Queensboro's accountant, the owners and employees of Queensboro kept CW#1 apprised of the various ways in which Queensboro was used as a means to commit fraud. The fraudulent activity that CW#1 was

Honorable I. Leo Glasser
November 27, 2011

informed of, and in some instances asked to directly participate in, included double-billing clients and keeping no-show employees on the payroll at the behest of the defendant.

For example, in consensually recorded conversations, Casper, the primary employee of Queensboro who helped orchestrate several of the frauds, informed CW#1, who prepared the payroll taxes for Queensboro, that the defendant assisted Napolitano in keeping unions out of Queensboro and, in exchange, Napolitano kept the defendant's son and son-in-law, George Romanello and James Davis, as "no-show" employees on Queensboro's books. See Exhibit D, January 31, 1999 Transcript (Casper explaining that "Rom's the one that kept the union out" and, as a result, Rom's family members are kept on the books as no-show employees); Exhibit E, January 31, 1998 Transcript (Casper explaining that James Davis is "Rom's son-in-law"). CW#1 likewise was asked to prepare W-2s for George Romanello and Davis on behalf of Queensboro, which he did. See Exhibit F, March 19, 1999 Transcript (Casper explaining to CW#1 that he needs the W-2s for "George [Romanello], James [Davis] and Vito [Napolitano]"]; Exhibit G, June 1, 1999 Transcript (Vito explaining to CW#1 that "he had James Davis . . . [and] George Romanelli [sic]" on "the books").

As another example, in consensually recorded conversations in which Casper reviewed Queensboro's overhead costs with CW#1, Casper informed CW#1 that although Queensboro's books reflected a payment of $5,000 monthly rent to Agnello for use of space at Agnello's cement plant, Queensboro did not actually pay rent to Agnello. Instead, Casper informed CW#1 that the arrangement had been devised to conceal Agnello's ownership interest in Queensboro and make it appear that Agnello was simply a landlord. See Exhibit H, November 29, 1998 Transcript (Casper explaining that to show "that we're not part of him," Carmine "has to show a rent check"); Exhibit I, December 13, 1998 Transcript (Casper explaining that Carmine "had to show that he was collecting something"); Exhibit J, November 3, 1998 Transcript (Casper explaining to CW#1 that Agnello claimed to own Queensboro's trucks); Exhibit K, November 29, 1998 Transcript (Casper explaining that "according to Carmine he owns everything").

As an additional example of criminal activity perpetuated through Queensboro, CW#1 was kept apprised of, and asked to assist with, a lucrative scam to double-bill

Honorable I. Leo Glasser
November 27, 2011

Queensboro's largest client, Trinity (hereinafter "Trinity" or the "Trinity account"), for cement.  See Exhibit L, December 17, 1998 Transcript (Casper explaining to CW#1 how they "double bill[]" Trinity).  CW#1 is expected to testify that he was told by Casper and others that Trinity was "Rom's account" and, further, that Napolitano was required to "kick up" money from Queensboro to the "guy from the Parkside," otherwise known as Anthony Federici.[3]  See Exhibit W, August 23, 1999 Transcript (co-conspirator informing CW#1 that Trinity is "Rom's account").

Not only was CW#1 kept informed of the various frauds perpetuated through Queensboro, but also, in several consensually recorded conversations, Casper informed CW#1 "who" Napolitano and Sowulski reported to, specifically the defendant and Agnello.  See Exhibit M, 4/18/99 Transcript (Casper explaining to CW#1 that "Rom is, ah, Vito's guy," that Rom is under "Tough Tony" and if disputes "get[] to Tony, it's because Rom can't handle it.").  Casper also informed CW#1 that the defendant and Agnello were associated with different organized crime families.[4]  See Exhibit M, 4/18/99 Transcript (In response to CW#1's question whether "Rom and Carmine" are the "same family, [or] different famil[ies]," Casper says "I believe it's different").

---

[3]   The government anticipates that cooperating witnesses will testify at trial that Anthony Federici, or "Tough Tony," is a captain in the Genovese crime family and owns the Parkside Restaurant, which is located in close vicinity to the defendant's gambling club.  Those cooperating witnesses are also expected to testify that the defendant reported to and served as acting captain for Anthony Federici, who had delegated much of his activities on behalf of the Genovese crime family to the defendant.  These cooperating witnesses are also expected to testify that, within the rules of La Cosa Nostra, associates of an organized crime family are expected to "kick up" a portion of money earned through illegal activity and scams to the higher ranking member to whom the associate reports.

[4]   Notably, CW#1 was informed of the fact that the defendant and Agnello were associated with organized crime and Queensboro in order to convey to CW#1 the need for both secrecy and obedience regarding Queensboro's fraudulent affairs.

6

Honorable I. Leo Glasser
November 27, 2011

        B.    CW#1's Testimony Regarding the Sit-down

        CW#1 is expected to testify that he became aware, through both first-hand knowledge and conversations with Casper, that Napolitano "skimmed" much of the cash that was coming into Queensboro, including from double-billing Trinity, for his personal use.  See Exhibit N, November 3, 1998 Transcript (Casper explaining to CW#1 that Napolitano skimmed $240,000 in the last six months); Exhibit O, November 29, 1999 Transcript (Casper explaining that Napolitano is taking "no less than $8,000 a week"); Exhibit P, November 29, 1999 Transcript (Casper stating to CW#1 "I don't have a fucking clue where the money is, I mean in the restaurant, I don't know what he [Vito], what - if he puts money up, he spends money or whatever he does . . . [t]he man's phenomenal how much money he's . . . he's . . . he's taking every week"); Exhibit P, November 29, 1999 Transcript (Casper stating "[t]he man's [Vito's] phenomenal with how much money he's taking every week"); Exhibit R, December 13, 1998 (Casper stating "he [Vito] decides what he wants to take").  CW#1 is also expected to testify that the dispute between Napolitano and Sowulski, which culminated in June 1999, concerned, among other things, the fact that Sowulski discovered that Napolitano had skimmed significant sums of money from Queensboro.

        CW#1 is further expected to testify that Casper kept CW#1 regularly apprised of the status of the dispute and ultimately informed CW#1 that the dispute could only be resolved by a "sit-down" between the defendant, acting on behalf of Napolitano, and Agnello, acting on behalf of Sowulski.  See Exhibit M, April 18, 1999 Transcript (Casper explaining that Napolitano "spoke to Rom, and Rom called the guy up in the Bronx [Carmine], and there, there may wind up being a sit-down"); see also Exhibit T, May 5, 1999 Transcript (Casper explaining "they're supposed to go up to the Bronx . . . to sit-down over there"); Exhibit U, June 6, 1999 Transcript (Casper explaining that "Vito brought his . . . so know it's gotta go for a sit-down").  Later, in June 1999, CW#1 was told by Casper and others associated with Queensboro that the sit-down between Romanello and Agnello, which primarily concerned the transfer of the Trinity account, had occured.  See Exhibit V, June 14, 1999 Transcript.  CW#1 was also informed that the outcome of the sit-down was not favorable to the defendant and Napolitano.  See Exhibit V, June 14, 1999 Transcript (Casper explaining to CW#1 "no money's changing hands . . . he [Vito] gets no money.  They split Trinity").  CW#1 is further expected to testify that he was

7

Honorable I. Leo Glasser
November 27, 2011

told by Casper that, following the sit-down, the defendant and "Tough Tony" Federici were unhappy with Napolitano. See Exhibit V, June 14, 1999 Transcript ("Tony and the other, Rom didn't uh, they weren't happy with him . . . all I know is that no money's changing hands."). Finally, after being informed that the defendant was unhappy with Napolitano, CW#1 was told by co-conspirators that Napolitano had been beaten as a result of the sit-down and observed Napolitano in a state that suggested he had recently been physically assaulted.

**ARGUMENT**

       The consensual recordings between CW#1 and others regarding 1) the various frauds perpetuated through Queensboro, including the payment of "no-show" employees and the scheme to defraud Trinity; 2) the identification of various participants in those frauds, including the identification of the defendant and Agnello as the individuals to whom Napolitano and Sowulski ultimately answered; and 3) the dispute between co-owners Napolitano and Sowulski, including its resolution by the defendant and Agnello, are admissible as non-hearsay because they are statements made by co-conspirators in furtherance of a conspiracy, i.e., the joint use of Queensboro as a vehicle and means to perpetuate fraud on behalf of the Genovese and Gambino crime families, pursuant to Federal Rule of Evidence ("Rule") 801(d)(2)(E). In addition, many of the above-referenced statements, specifically those that directly concern fraudulent activity such as the inclusion of "no-show" employees on Queensboro's payroll and the double-billing of Trinity, are statements against penal interest and thus are admissible pursuant to Rule 804(b)(3).

I.    Applicable Law and Analysis

       A.    Co-conspirator statements

       Rule 801(d)(2)(E) provides in relevant part that "[a] statement is not hearsay if . . . the statement is offered against a party and is . . . a statement by a co-conspirator of a party [made] during the course and in furtherance of the conspiracy."). A statement comes within this Rule if there was a conspiracy whose members included the declarant and the party against whom the statement is offered, and the statement was made during the course of and in furtherance of the conspiracy. See, e.g., Bourjaily v. United States, 483 U.S. 171, 175 (1987). Further, the person to

Honorable I. Leo Glasser
November 27, 2011

whom the statement is made need not be a co-conspirator, so long as the statements were meant to prompt the listener to respond in a way that promoted or facilitated the goals of the conspiracy. See United States v. Beech-Nut Nutrition Corp., 871 F.2d 1181, 1199 (2d Cir. 1987).

Although admissible co-conspirator statements are limited to those made "in furtherance" of the conspiracy, this standard is not unduly restrictive.  Rather, the standard permits introduction of a co-conspirator's statements "that provide reassurance, or seek to induce a co-conspirator's assistance, or serve to foster trust and cohesiveness, or inform each other as to the progress or status of the conspiracy." United States v. Maldonado-Rivera, 922 F.2d 934, 959 (2d Cir. 1990); see also United States v. Tarantino, 846 F.2d 1384, 1412 (D.C. Cir. 1988) (noting that the standard also permits the introduction of any statement that "reasonably [can] be interpreted as encouraging a co-conspirator or other person to advance the conspiracy, or as enhancing a co-conspirator or other person's usefulness to the conspiracy").  Indeed, the requirement that the challenged statement be "in furtherance of" the conspiracy is satisfied if the statement's objective is "designed to promote or facilitate achievement of the goals of the conspiracy." United States v. Rivera, 22 F.3d 430, 436 (2d Cir. 1994).  Co-conspirator statements may be found to be "in furtherance" of the conspiracy if they "prompt the listener to respond in a way that facilitates the carrying out of criminal activity." United States v. Rahme, 813 F.2d 31, 35 (2d Cir. 1987).  For instance, in United States v. Beech-Nut Nutrition Corp., the Second Circuit upheld the admission of co-conspirator statements that "were designed to 'cover up'" a criminal conspiracy, in that case the distribution of adulterated juice, pursuant to Rule 801(d)(2)(E).  871 F.2d at 1199.

The Genovese and Gambino crime families, and in particular the defendant, Napolitano, Agnello and Sowulski, used Queensboro as a vehicle to commit frauds for the financial gain of the crime families.  Casper, as a trusted employee of Queensboro, helped to commit and facilitate the various frauds, such as the double-billing of Trinity and the fraudulent inclusion of the defendant's family members on the payroll, on a daily basis.  The defendant's participation in the scheme is clearly demonstrated by, among other things, (1) consensual recordings in which Casper explained that the defendant required Napolitano to keep the defendant's family members on the payroll as "no-show" employees in exchange for his assistance in keeping unions out of

9

Honorable I. Leo Glasser
November 27, 2011

Queensboro, (2) consensual recordings in which the Trinity account is identified as "Rom's account," (3) CW#1's anticipated testimony that Napolitano "kicked up" money to the "guy from the Parkside," i.e., Anthony Federici, the man on whose behalf the defendant served as acting captain, and (4) the fact that the defendant was called in to act on Napolitano's behalf and "handle" the dispute that resulted in the transfer of Queensboro to Sowulski. Moreover, because CW#1 acted as Queensboro's accountant for Napolitano, co-conspirators such as Casper regularly kept CW#1 informed of the status and progress of developments related to Queensboro and its various frauds.[5] All of these conversations, as detailed above, are admissible as co-conspirator statements because they were made to CW#1, the company's accountant, in the course of and in furtherance of the conspiracy and served not only to keep CW#1 apprised of the status and progress of the conspiracy, but also to enlist his help. See Maldonado-Rivera, 922 F.2d at 959; Beech-Nut Nutrition Corp., 871 F.2d at 1199.

      Moreover, the use of Queensboro to commit various frauds for the benefit of the Genovese crime family is integrally related to, and inextricably intertwined with, both the racketeering conspiracy charged in Count One and the defendant's extortion of Napolitano charged in Racketeering Act Two. For example, the defendant's position as an acting captain within the hierarchy of the Genovese crime family, as well as his position vis-a-vis his associate Napolitano, is demonstrated by the fact that the defendant: (1) used his influence to keep the unions out of Queensboro; (2) required Napolitano to keep the defendant's family members as "no-show employees on the payroll; (3) required Napolitano to make payments to the hierarchy within the Genovese family; and (4) acted on Napolitano's behalf at the sit-down, where the defendant held a position commensurate with Agnello, a captain in the Gambino crime family. In addition, the fact that the dispute between Napolitano and Sowulski resulted in Napolitano's loss of Queensboro and the Trinity account, which had been "Rom's account," provides important context for the defendant's extortion of Napolitano.

---

[5] For example, in addition to keeping CW#1 informed of the status of the Trinity account, co-conspirators including Casper and Sowulski also actively sought CW#1's assistance in perpetuating the fraud. Specifically, following the sit-down, Casper and Sowulski sought CW#1's help in structuring the repayment of the loan owed to Trinity so as not to jeopardize the double-billing scheme.

Honorable I. Leo Glasser
November 27, 2011

       B.    Statements Against Penal Interest

Where a declarant is unavailable, statements made against a person's penal interests are admissible under Rule 804(b)(3).[6] Rule 804(b)(3) excepts from the hearsay rule "[a] statement which . . . at the time of its making . . . so far tended to subject the declarant to civil or criminal liability . . . that a reasonable person in the declarant's position would not have made the statement unless believing it to be true."

Admission of such statements "hinges on whether the statement was sufficiently against the declarant's penal interest that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." United States v. Williams, 506 F.3d 151, 155 (2d Cir. 2007) (quoting Williamson v. United States, 512 U.S. 594, 603-04 (1994) (quoting Rule 804(b)(3))) (internal quotation marks omitted). "Whether a challenged statement is sufficiently self-inculpatory can only be answered by viewing it in context" and "[t]hus, this determination must be made on a case-by-case basis." Id. (citations omitted).

Many of the above-referenced statements, specifally those in which the co-conspirators such as Casper reference their involvement in illegal activities such as the scheme to defraud Trinity or the false inclusion of "no-show" employees on Queensboro's payroll, are admissible pursuant to Rule 804(b)(3) because they are, in effect, admissions subjecting those co-conspirators to civil or criminal liability. See conversation between CW#1 and Steve Casper on December 17, 1998 (Casper explaining that the company knowingly loads the truck with half of the cement actually purchased by Trinity); see also conversation between CW#1 and Steve Casper on 6/24/99 (Casper referring to how they "ripped [Trinity] off").

II. Conclusion

Based on the above, the government respectfully requests that the Court permit CW#1 to testify about the ways in which Queensboro was used as a means to commit fraud for financial gain,

---

      [6]    The government anticipates that Casper would assert his privilege against self-incrimination if subpoenaed to testify at trial, and accordingly is unavailable.

11

Honorable I. Leo Glasser
November 27, 2011

including statements made to CW#1 by co-conspirators in those various schemes.  In addition, the government requests that the Court permit the introduction at trial of consensual recordings in which participants in those frauds explained the various schemes to CW#1 and also informed CW#1 about the involvment of the defendant, on behalf of the Genovese crime family, and Agnello, on behalf of the Gambino crime family, in Queensboro.

                                      Respectfully submitted,

                                      LORETTA E. LYNCH
                                      United States Attorney

By:  /s/ Amanda Hector
     Amanda Hector
     Jack Dennehy
     Kristin Mace
     Assistant United States Attorneys
     (718) 254-6212

cc:  Gerald McMahon, Esq. (via ECF)
     Mathew Mari, Esq. (via ECF)